UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY,                                    Civil Action No._____
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY,
AND ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,

                Plaintiffs,

vs.

ARIS DIAGNOSTIC MEDICAL, PLLC,
FAST CARE MEDICAL DIAGNOSTICS, PLLC,
IOSIF ARONOV, M.D.,
SIMON RYOO, M.D.,
RICHARD RAFAL, M.D., AND
ARTUR PINKHASOV,

                Defendants.

## PLAINTIFFS' COMPLAINT

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company, (collectively, "Allstate" and/or "Plaintiffs") by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

**I.**      **INTRODUCTION**

1.      This action involves the unlawful operation, management, and control of two purportedly physician-owned professional medical corporations for the purposes of defrauding Allstate and exploiting New York law.

2.      The Defendants, Fast Care Medical Diagnostics, PLLC ("Fast Care Medical Diagnostics") and Aris Diagnostic Medical, PLLC ("Aris Diagnostic Medical") and (collectively, the "PC Defendnats"), were, at all times relevant, (a) diagnostic imaging centers that were

1

nominally owned by a physician, Iosif Aronov, M.D. ("Aronov"), an internist who does not practice radiology and has never engaged in the practice of medicine through either of the PC Defendants, (b) unlawfully managed and controlled by one or more non-physician, and (c) caused to submit to Allstate hundreds of fraudulent and/or non-compensable charges for diagnostic imaging services—i.e., magnetic resonance imaging ("MRI") studies.  These diagnostic imaging services were purportedly provided to individuals involved in automobile accidents who were eligible for coverage under an insurance policy issued by Allstate ("Insureds").

3.      As explained below, the PC Defendants are not eligible to seek or collect No-Fault benefit payments from Allstate because; in fact, these entities have never been eligible to collect such benefits as the PC Defendants are fraudulently incorporated New York professional medical corporations whose nominal owner (i.e., Aronov) has failed to engage in the practice of medicine in violation of Business Corporation Law § 1507.

4.      Moreover, the PC Defendants are not eligible to seek or collect No-Fault benefit payments from Allstate because; in fact, these entities have never been eligible to collect such benefits as (a) the PC Defendants are unlawfully owned and controlled by one or more non-physician, and (b) the PC Defendants were purposely and knowingly caused to unlawfully split their professional fees and profits with one or more non-physician.

5.      In furtherance of this scheme, the defendant Artur Pinkhasov ("Pinkhasov") – who is neither licensed to practice medicine nor lawfully authorized to control, manage, or share in the professional fees and profits of physician-owned professinal corporations – partnered with Aronov and purposely and knowingly conspired with the defendants Simon Ryoo, M.D. ("Ryoo"), and Richard Rafal, M.D. ("Rafal"), to operate and control the PC Defendants.

2

6.      To further propel this scheme, the defendants purposely orchestrated the organization of Fast Care Medical Diagnostics and Aris Diagnostic Medical to create the appearance that the entities were solely owned and controlled by licensed physicians.  In reality, however, at least one or more non-physician (e.g., Pinkhasov) actually managed and controlled the PC Defendants and siphoned off Fast Care Medical Diagnostics' and Aris Diagnostic Medical's professional fees and profits.

7.      As detailed below, the defendants schemed to defraud Allstate by:

a)      Incorporating Fast Care Medical Diagnostics to create the illusion that Aronov and Rafal were the entity's sole shareholders, officers, and/or directors;

b)      Incorporating Aris Diagnostic Medical to create the illusion that Aronov and Ryoo were the entity's sole shareholders, officers, and/or directors;

c)      Allowing Pinkhasov to control the PC Defendants and profit from their operation;

d)      Providing diagnostic imaging studies through the PC Defendants and then materially misrepresenting the results of these studies; and

e)      Deliberately causing the PC Defendants to aggressively seek reimbursement of their patients' No-Fault benefits even though the defendants knew that Fast Care Medical Diagnostics and Aris Diagnostic Medical were never lawfully eligible to seek, collect, or retain No-Fault benefit payments.

8.      Overall, the PC Defendants never had any right to seek, collect, or retain No-Fault benefit payments from Allstate.

9.      As a direct and proximate result of the defendants' unlawful conduct, Allstate was wrongfully induced to make "No-Fault" insurance payments totaling $1,510,679.06 in connection with reimbursement demands made by the PC Defendants.

10.     Through this action, Allstate seeks to recover all monies wrongfully paid to the PC Defendants.

11.     Through this action, Allstate also seeks a declaration that it has no legal obligation to make any payments on any and all previously denied and/or currently unpaid claims submitted by (or on behalf of) the PC Defendants because the services purportedly rendered to Allstate Insureds were rendered in direct violation of one or more New York State licensing requirements necessary to provide such services, thus rendering the PC Defendants completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

12.     Allstate's claim for compensatory damages includes: (a) payments made by Allstate to the PC Defendants in reliance upon the defendants' false representations that the PC Defendants were eligible to receive reimbursement under New York's No-Fault laws; (b) payments made by Allstate to the PC Defendants in reliance upon the false medical documentation submitted, or caused to be submitted, by the defendants; (c) treble damages; (d) interest; (e) costs; and (f) attorney's fees.

13.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

14.     Each of the defendants named herein conspired with one another to accomplish and to further the objections of their fraudulent scheme.

15.     The defendants purposely designed and executed this scheme to elicit payment of automobile insurance contract proceeds from Allstate to the PC Defendants for the benefit of each and all of the defendants named herein.

16.     In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which the defendants perpetrated their scheme to defraud.

17.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

18.     Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted hundreds of bills for healthcare services purportedly rendered to persons eligible for insurance coverage under Allstate insurance policies.

19.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; (c) unjust enrichment; and (d) declaratory relief.

## II.     THE PARTIES

### A.     PLAINTIFFS

20.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

21.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

22.     At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company were each authorized to conduct business in New York.

**B.     DEFENDANTS**

**1.     Iosif Aronov, M.D.**

23.     Aronov resides in and is a citizen of the State of New York.

24.     At all times relevant, Aronov was licensed by the State of New York to practice medicine.

25.     At all times relevant, Aronov was a licensed internist and not a radiologist.

26.     During the relevant period, Aronov was falsely held out to the public and to Allstate as the shareholder, officer, and/or director of Fast Care Medical Diagnostics and Aris Diagnostic Medical.

27.     Even though he did not fully control Fast Care Medical Diagnostics and Aris Diagnostic Medical nor engage in the practice of radiology at either location, Aronov participated in the operation of these entities, and is thus responsible for the fraudulent and non-compensable healthcare services rendered to the patients at issue in this Complaint.

**2.     Richard Rafal, M.D.**

28.     Rafal resides in and is a citizen of the State of New York.

29.     At all times relevant, Rafal was licensed by the State of New York to practice medicine.

30.     During the relevant period, Rafal was falsely held out to the public and to Allstate as a shareholder, officer, and/or director of Fast Care Medical Diagnostics.

31.     Even though he did not fully control Fast Care Medical Diagnostics, Rafal participated in the operation of Fast Care, and is thus responsible for the fraudulent and non-compensable healthcare services rendered to patients of Fast Care at issue in this Complaint.

**3**.     **Simon Ryoo, M.D.**

32.     Ryoo resides in and is a citizen of the State of New Jersey.

33.     At all times relevant, Ryoo was licensed by the State of New York to practice medicine.

34.     During the relevant period, Ryoo was falsely held out to the public and to Allstate as a shareholder, officer, and/or director of Aris Diagnostic Medical.

35.     Even though he did not fully control Aris Diagnostic Medical, Ryoo participated in the operation of Aris, and is thus responsible for the fraudulent and non-compensable healthcare services rendered to patients of Aris Diagnostic Medical at issue in this Complaint.

**4.     Fast Care Medical Diagnostics, PLLC**

36.     Fast Care Medical Diagnostics is organized under New York law and purports to be a physician-owned professional corporation with a principal place of business located at 79-01 Metropolitan Avenue in Middle Village, New York.

37.     Since February 28, 2012, Aronov and Rafal have falsely purported to be the sole shareholders, officers, and/or directors of Fast Care Medical Diagnostics.

38.     At all times relevant to this Complaint, Aronov has failed to engage in the practice of medicine at Fast Care Medical Diagnostics in violation of Business Corporation Law § 1507.

39.     At all times relevant to this Complaint, one or more non-physician (e.g., Pinkhasov) has had ownership and controlling interests in Fast Care Medical Diagnostics.

40.     As part of this scheme, Fast Care Medical Diagnostics was caused to bill Allstate even though it was (i) nominally owned by a physician (i.e., Aronov) that failed to engage in the practice of radiology, and (ii) operated and controlled by one or more non-physician (e.g., Pinkhasov), therefore rendering the professional medical corporation ineligible to seek or collect No-Fault benefits.

41.     As a further part of this scheme, Fast Care Medical Diagnostics was caused to bill Allstate for fraudulent and non-compensable healthcare services in relation to several patients at issue in this Complaint.

42.     Because Fast Care Medical Diagnostics was nominally owned by a physician (i.e., Aronov) that failed to engage in the practice of radiology and was unlawfully operated and controlled by one or more non-physician (e.g., Pinkhasov), it was operated in direct violation of N.Y. Bus. Corp. Law §§ 1507 and 1508, and was therefore ineligible to collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**5.     Aris Diagnostic Medical, PLLC**

43.     Aris Diagnostic Medical is organized under New York law and purports to be a physician-owned professional corporation with a principal place of business located at 88-09 101st Avenue in Ozone Park, New York.

44.     Since September 24, 2012, Aronov and Ryoo have falsely purported to be the sole shareholders, officers, and/or directors of Aris Diagnostic Medical.

45.     At all times relevant to this Complaint, Aronov has failed to engage in the practice of medicine at Aris Diagnostic Medical in violation of Business Corporation Law § 1507.

46.     At all times relevant to this Complaint, Pinkhasov has had ownership and controlling interests in Aris Diagnostic Medical.

47.     As part of this scheme, Aris Diagnostic Medical was caused to bill Allstate even though it was (i) nominally owned by a physician (i.e., Aronov) that failed to engage in the practice of radiology, and (ii) operated and controlled by one or more non-physician (i.e., Pinkhasov), therefore rendering the professional medical corporation ineligible to seek or collect No-Fault benefits.

48.     As a further part of this scheme, Aris Diagnostic Medical was caused to bill Allstate for fraudulent and non-compensable healthcare services in relation to several patients at issue in this Complaint.

49.     Because Aris Diagnostic Medical was nominally owned by a physician (i.e., Aronov) that failed to engage in the practice of radiology and was unlawfully operated and controlled by one or more non-physician (i.e., Pinkhasov), it was operated in direct violation of N.Y. Bus. Corp. Law §§ 1507 and 1508, and was therefore ineligible to collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 6. Artur Pinkhasov

50.     Pinkhasov resides in and is a citizen of the State of New York.

51.     Pinkhasov has never been licensed to provide professional health care services, in any form, in the State of New York.

52.     At all relevant times, Pinkhasov, individually and through entities under his control, has maintained unlawful management and controlling interests in Aris Diagnostic Medical and Fast Care Medical Diagnostics.

53.     Because he participated in the operation and management of the PC Defendants, and because he conducted the affairs of the PC Defendants through a pattern of mail fraud

racketeering activity, Pinkhasov is responsible for the fraudulent and non-compensable healthcare services rendered to the patients at issue in this Complaint.

## III.  JURISDICTION AND VENUE

54.  Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

55.  Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

56.  Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

57.  At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws (as detailed *infra*).

58.  The defendants' activities in and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

59.  As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent and non-compensable demands for payment under New York's No-Fault laws, a substantial relationship exists between the transactions at issue and Allstate's causes of action.

## IV.  NO-FAULT LAWS AND LICENSING STATUTES

### A.  NEW YORK'S NO-FAULT LAWS

60.  Allstate underwrites automobile insurance in the State of New York.

61.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

62.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.), and the regulations promulgated pursuant thereto (11 NYCRR § 65, et seq.) (collectively, "the No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault benefits") to Allstate claimants.

63.     Under the New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

64.     "Basic economic loss" is defined to include "all necessary expenses" for medical services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

65.     No-Fault benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

66.     A patient can assign his/her No-Fault benefits to healthcare providers.

67.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").

68.     Alternatively, healthcare providers may submit claims to insurance carriers using the Health Care Financing Administration Claim Form (known as the "HCFA-1500" form).

69.     NF-3 and HCFA-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

70.     Indeed, pursuant to N.Y. Ins. Law § 403(d), NF-3 and HCFA-1500 forms must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime…

71.     It is a material misrepresentation to submit NF-3 and HCFA-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

**B.     UNLAWFUL CONTROL OF PROFESSIONAL SERVICE ENTITIES**

72.     New York law requires that all professional healthcare service corporations be owned and controlled by appropriately licensed healthcare professionals.  *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

73.     Similarly, New York law prohibits anyone from engaging in the practice of medicine except those licensed to practice medicine.  *See* N.Y. Educ. Law §§ 6521-6522.

74.     Thus, in New York, only a licensed physician may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable to this case—economic benefit from physician services.

75.     Moreover, for a provider of healthcare services to be eligible to bill for and collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, professional service entities are not eligible to bill for services, or collect for those services from an insurer, where the services were actually rendered by persons who are not employees of the professional service entity, such as independent contractors.

76.     New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

77.     New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

78.     New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to an individual unless this individual is "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

79.     Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

80.     New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine.

81.     Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

82.     Licensed physicians are also prohibited from delegating professional responsibilities to persons who lack qualification, training, experience, and/or licensure to perform them.

83.     Further, under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

84.     The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

85.     New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

86.     Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

87.     In New York, insurers may seek affirmative recovery against individuals and entities that have violated the above statutes and regulations.

88.     In *State Farm Mutual Automobile Insurance Company v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional health care services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional health care services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

89.     In the matter *Metroscan Imaging P.C. v. Government Employees Insurance Company*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), it was held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

90.     As detailed below, the defendants purposely and knowingly violated one or more of the above-cited New York statutes and regulations through the operation and management of Fast Care Medical Diagnostics and Aris Diagnostic Medical.

   **C.    NEW YORK WORKERS' COMPENSATION FEE SCHEDULE**

88.      The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

89.     Both healthcare providers and automobile insurers consult the Fee Schedule to determine the level of reimbursement payable on legitimate claims.

90.     The purpose of the Fee Schedule is to: (a) provide comprehensive billing guidelines in order to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be charged for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by health care service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

91.     Section 5102(a)(1) of the No-Fault Law defines "basic economic loss" as including "[a]ll necessary expenses incurred for…professional health services," "subject to the limitations of" Insurance Law § 5108.

92.     Insurance Law § 5108(b) provides that the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating" the provisions of the New York No-Fault Law and the Workers' Compensation Law "with respect to charges for the professional health services" specified in Insurance Law § 5102(a)(2), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

93.     Insurance Law § 5108(a) also provides that the "charges for services specified in" Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board."

## V.     FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

94.     New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of healthcare services, and is also designed to require prompt payment of patient claims.

16

95.     As a result, the submission of facially valid bills by healthcare service providers for patient services often will result in prompt payment from a No-Fault insurer.

96.     However, New York's No-Fault laws and enacting regulations are clear that providers are not eligible to seek or receive payment under Insurance Law § 5102 if they fail to meet any New York State or local licensing requirement necessary to perform such service in New York.

97.     As explained below, at all relevant times, the defendants have taken advantage of New York's No-Fault system by operating the PC Defendants in violation of one or more applicable New York state licensing requirement governing the provision of professional physician services.

98.     At all times relevant, Aronov has been listed as the nominal owner of Fast Care Medical Diagnostics and Aris Diagnostic Medical, despite practicing internal medicine and not radiology.

99.     At all times relevant, Aronov did not personally treat or provide radiology services to any patient of Fast Care Medical Diagnostics or Aris Diagnostic Medical.

100.    Moreover, the defendants, at all times relevant, knew that (a) the PC Defendants were actually controlled by one or more non-physician (e.g., Pinkhasov), and (b) the PC Defendants were caused to unlawfully split professional physician fees and profits with a non-physician.

101.    The control exerted by the one or more non-physician (e.g., Pinkhasov) over the PC Defendants compromised patient care, as the provision of healthcare services by the PC Defendants was subject to the pecuniary interests of a non-physician.

102. The defendants' purported provision of diagnostic imaging services to Allstate Insureds jeopardized patient health and safety, as the results of such services were often utilized by other healthcare professionals to guide the course of patient treatment.

103. Further, the defendants, at all relevant times, knew that the bills submitted to Allstate were non-compensable under New York's No-Fault laws.

104. Because the PC Defendants were, (i) nominally owned by a physician (i.e., Aronov) who failed to engage in the practice of radiology, (ii) unlawfully operated and controlled by one or more non-physician (e.g., Pinkhasov), and (iii) were used as a conduit to unlawfully split professional fees with one or more non-physician, the PC Defendants were operated in violation of New York law, thus rendering Fast Care Medical Diagnostics and Aris Diagnostic Medical completely ineligible for No-Fault reimbursement under Insurance Law § 5102(a)(1).

105. To further this scheme, Pinkhasov and Aronov purposely and knowingly conspired with the licensed radiologists, Rafal, and Ryoo, to have these physicians—albeit facially—act as the nominal shareholders, officers, and/or directors of Fast Care Medical Diagnostics and Aris Diagnostic Medical.

A. THE UNLAWFUL OPERATION AND CONTROL OF THE PC DEFENDANTS

1. THE PARTNERSHIP BETWEEN ARONOV AND PINKHASOV

106. The underlying nature of the defendants' scheme has been the continued, unlawful operation of diagnostic imaging companies at the facilities located at 88-09 101st Avenue, Ozone Park, New York (the "101st Avenue Facility) and 79-01 Metropolitan Avenue, Middle Village New York (the "Metropolitan Avenue Facility").

107. Each of the PC Defendants have been caused to operate from the 101st Avenue Facility and the Metropolitan Avenue Facility throughout the relevant period.

108. While Pinkhasov and Aronov, at all relevant times, have unlawfully managed and

controlled the PC Defendants at the 101st Avenue Facility and Metropolitan Avenue Facility, their partnership pre-dates the formation of each of the PC Defendants.

109.    Although Pinkhasov has never been licensed to render any form of medical service in the State of New York, he has established a history of being closely tied to the provision of healthcare services and durable medical equipment to No-Fault claimants.

110.    At all relevant times, Pinkhasov has (i) owned and operated the medical management companies, A&P Diagnostic, LLC and Artur Support Services, Inc.; (ii) owned and operated the durable medical equipment and medical supply companies, Accelerated DME Recovery, Inc. and AAAMG Leasing Corp.; and (iii) served as the manager of the Cantazo Media Group, LLC, which operates as a lawyer based marketing agency geared toward personal injury cases.

111.    Although Aronov has been licensed to practice medicine in the State of New York since 2005, Aronov's practice has focused on internal medicine and not radiology.

112.    Despite having not engaged in the practice of radiology, at all relevant times, Aronov has served as a shareholder, officer, and/or director of AP Diagnostic Medical, P.C., Fast Care Medical Diagnostics, and Aris Diagnostic Medical.

113.    Aronov and Pinkhasov ultimately utilized their corporations, A&P Diagnostic, LLC ("A&P Diagnostic") and AP Diagnostic Medical, P.C. ("AP Diagnostic Medical" formerly known as IOS Medical, P.C.) to commence the scheme to defraud and directly engage in the provision of healthcare services, which they were forbidden from doing directly, namely: (a) controlling the practice of a diagnostic imaging facility; and (b) charging for (and deriving economic benefit from) the purported provision of diagnostic imaging service.

114.    The records filed with the New York Department of State, Division of Corporations

indicate that A&P Diagnostic was incorporated by Pinkhasov on or about April 3, 2009.

115.    Further, the records filed with the New York Department of State, Division of Corporations indicate that IOS Medical, P.C. ("IOS Medical") was incorporated by Aronov on or about April 28, 2009, only 25 days after the incorporation of A&P Diagnostic.

116.    Once formed, Pinkhasov, through A&P Diagnostic, and Aronov, through IOS Medical, began acquiring the equipment necessary to operate a diagnostic imaging facility.

117.    For example, Pinkhasov, through A&P Diagnostic, purchased the Hitachi Airis MRI (Serial No. A015), which was located at the 101st Avenue Facility.

118.    Aronov, through IOS Medical, purchased the Hitachi Airis II 0.3T Open Permanent Magnet System (Serial No. 00, 391850), which was also located at the 101st Avenue Facility.

119.    After obtaining the required diagnostic imaging equipment, Aronov transferred the operation of IOS Medical from his residence to the 101st Avenue Facility.

120.    On or about November 9, 2009, a Certificate of Amendment to the Certificate of Incorporation of IOS Medical was filed with the New York Department of State, Division of Corporations, amending IOS Medical's to AP Diagnostic Medical.

121.    Conspicuously, the amending of the name from IOS Medical to that of AP Diagnostic Medical not only aligned the professional medical corporation with that of the management company (i.e., A&P Diagnostic), but represented the initials of the two partners (i.e., Aronov and Pinkhasov).

122.    The incorporation and operation of AP Diagnostic Medical provided Aronov and Pinkhasov with an opportunity to submit No-Fault benefit claims to insurance carriers in the State of New York that otherwise would not have been available.

123.     As a non-licensed layperson, Pinkhasov is precluded from legally (1) providing professional healthcare services, (2) holding an ownership or controlling interest in any entity organized to provide professional healthcare services, or (3) sharing in the fees or profits generated through the delivery of professional healthcare services.

124.     By partnering with Aronov, a licensed physician in the State of New York, Aronov and Pinkhasov circumvented the State of New York's licensing requirements by having Aronov represent that he was the sole shareholder, officer, and/or director of the professional medical corporation (i.e., AP Diagnostic Medical).

125.     After the establishment of the diagnostic imaging center at the 101st Avenue Facility, the defendants made the decision to expand the scheme to defraud to a second diagnostic imaging facility in or about 2012.

### 2.     FAST CARE MEDICAL DIAGNOSTICS

126.     The timing of the decision to expand the scheme to a second location coincided with the closing of a separate diagnostic imaging company (the "predecessor diagnostic imaging company") that had operated out of the facility located at 79-01 Metropolitan Avenue in Middle Village, New York (the "Metropolitan Avenue Facility") since 1998.

127.     As evidenced by the indictment and sentencing memorandum in the matter *USA v. Vilshanetski et al.*, United States District Court for the Southern District of New York, Criminal Docket No.: 1:08-cr-00751-LAK-11, Gennady "Genna" Broytman ("Broytman") served as the principal and owner of Midvillage Administrative Services Corp., which provided billing, collection, and administrative services to the predecessor diagnostic imaging company.

128.     In connection with these purported services, Broytman, through Midvillage Administrative Services Corp., issued payments to the two owners of a medical clinic located at

3003 Avenue K in Brooklyn, New York in return for unlawful referrals to the predecessor diagnostic imaging company.

129.     Although the predecessor diagnostic imaging company attempted to continue its fraudulent operation even after Broytman pled guilty, the predecessor diagnostic imaging company was forced to vacate the Metropolitan Avenue Facility when the owner of the property obtained a $163,359.00 judgment against the leaseholder of the office space, which was the management company for the predecessor diagnostic imaging company.

130.     Remarkably, the nominal owner of the predecessor diagnostic imaging company would later be hired by Pinkhasov and/or Aronov to assist with the reading and interpreting of MRI films and other radiology studies at Aris Diagnostic Medical.

131.     In light of the vacancy at the Metropolitan Avenue Facility, a corporation named MVP Support Group, Inc. entered into a lease agreement for the office space at the Metropolitan Avenue Facility on or about September 15, 2011.

132.     Upon information and belief, Pinkhasov is a shareholder, officer, and/or director of MVP Support Group, Inc.

133.     On or about January 28, 2012, Aronov entered into an Equipment Sales Agreement with Proton Services, Inc., wherein a 2003 Siemens Symphony 1.5 Tesla MRI was procured and installed at the Metropolitan Avenue Facility.

134.     Pinkhasov, a layperson, and/or Aronov, an internist, subsequently recruited Rafal, a licensed radiologist, to partner with Aronov to serve as the nominal physician-owners of Fast Care Medical Diagnostics.

135.     To circumvent New York law and induce the New York State Education Department ("Education Department") to issue a certificate of authority, Pinkhasov conspired with

Aronov and Rafal to falsely represent in the corporate filings that Aronov and Rafal were the sole shareholders, officers, and/or directors of Fast Care Medical Diagnostics.

136. Upon information and belief, in connection with Fast Care Medical Diagnostics' operation out of the Metropolitan Avenue Facility, Aronov, on behalf of Fast Care Medical Diagnostics, was caused to enter into a sublease and/or Facilities Use agreement with MVP Support Group Corp. for the use of the office space at the Metropolitan Avenue Facility.

137. Fast Care Medical Diagnostics ultimately entered into an Agreement of Lease with the owner of the Metropolitan Avenue Facility on or about March 1, 2012.

138. Pinkhasov and Aronov used the façade of Fast Care Medical Diagnostics to do indirectly what they were forbidden from doing directly, namely: (a) controlling the practice of a diagnostic imaging facility; and (b) charging for (and deriving economic benefit from) the purported provision of diagnostic imaging services at the Metropolitan Avenue Facility.

139. To solidify the unlawful management and control over Fast Care Medical Diagnostics, Aronov and Rafal were caused to enter into the Operating Agreement of Fast Care Medical Diagnostics on or about June 24, 2015.

140. At face value, the Operating Agreement of Fast Care Medical Diagnostics purports to serve as an accord between the parties to, "define the terms of their relationship, impose restrictions on the transfer or other disposition of the Units, grant rights with respect to the transfer of Units, provide for the disposition of the Units of a Withdrawing Member … and provide for other contingencies."

141. In actuality, the Operating Agreement of Fast Care Medical Diagnostics yielded the sole management and control of the professional medical corporation to Aronov, an internist, rather than Rafal, a licensed radiologist.

142.     The Operating Agreement of Fast Care Medical Diagnostics explicitly states that, "as long as each of Aronov and Rafal shall continue to be the record and beneficial owner of his respective Units, Aronov shall be elected as the sole Managing Member of the Company."

143.     As the Managing Member, Aronov was "solely responsible for all day to day operations of the Company, including hiring and firing administrative personnel, oversight of billing and collections, handling accounts payable … and managing all financial, accounting and legal matters."

144.     Although the Operating Agreement of Fast Care Medical Diagnostics required any action to be taken by the Members of the Company (i.e., Aronov and Rafal) to be approved by at least fifty-one (51%) percent of membership interests entitled to vote, Aronov maintained full control by requiring that, "no action may be taken without Aronov voting in favor thereof."

145.     The Operating Agreement of Fast Care Medical Diagnostics further restricted the transfer, assignment, pledge, or encumbrance of the Fast Care Medical Diagnostic Units without the approval of the other members.

146.     For instance, the Operating Agreement of Fast Care Medical Diagnostics states that, "no Member holding 20% or less of the Company shall pledge, assign, sell, gift, transfer or hypothecate or otherwise dispose of or encumber his Units, or cause or permit a change in the legal or beneficial ownership of his Units … except with the prior written consent of all of the other Members or as otherwise specifically permitted by this Agreement."

147.     Further, "[a]ny other Member holding more than 20% of the Company shall have the right to sell all or less than all his Units without the prior consent of the other Members."

148.     These restrictions were specifically set in place to burden Rafal and reinforce Aronov's control, as Aronov maintained an 80% membership interest in Fast Care Medical Diagnostics in contrast to Rafal's 20% membership interest.

149.     These restrictions further provided a caveat in which Aronov would be permitted to transfer his ownership interest to his wife, as a duly licensed physician, at any time, in which she would be permitted to assume the position of the new sole Managing Member.

150.     Notably and akin to her husband, Aronov's wife is a licensed physician whose specialty is anesthesiology and not radiology.

151.     Pursuant to the terms of the Operating Agreement of Fast Care Medical Diagnostics, Rafal never: (a) controlled or maintained any of Fast Care Medical Diagnostics' corporate books and records; (b) selected, directed, and/or controlled any of the individuals and entities that were responsible for the handling of Fast Care Medical Diagnostics' business affairs; or (c) hired or supervised any of Fast Care Medical Diagnostics' employees or independent contractors.

152.     Rafal was, at best, nothing more than an employee of Fast Care Medical Diagnostics, who was tasked with reading and interpreting MRI films and other radiology studies.

153.     In furtherance of this scheme, Pinkhasov and/or Aronov caused Fast Care Medical Diagnostics to enter into at least five (5) "marketing", "management", and "service" agreements in order to obtain patient referrals.

154.     The service of process address for one of these "marketing" companies is the former service of process address for A&P Diagnostic (i.e., 447 Main Street, Armonk, New York), which is also the same address for the barber shop that Pinkhasov, as a licensed barber, maintains a business affiliation.

155.     Notably, the owner of record of this "marketing" company previously pled guilty to several counts of Conspiracy to Defraud the United States and Frauds and Swindles (Mail Fraud) in the matter *USA v. Koplan, et al.*, United States District Court for the Southern District of New York, Criminal Docket No.: 1:03-cr-01426-KMW-4.

156.     At all relevant times, Pinkhasov and Aronov have exercised substantial control over the operation and management of Fast Care Medical Diagnostics, despite neither being a licensed radiologist.

157.     At all relevant times, Aronov has actively participated in the day-to-day management of Fast Care Medical Diagnostics' business affairs without engaging in the practice of radiology or participating in the rendering of the healthcare services that are purportedly provided to patients at the Metropolitan Avenue Facility.

158.     Because their conduct was unlawful, the defendants purposely and knowingly took steps to conceal Pinkhasov's role in in the operation and management of the Metropolitan Avenue Facility and Aronov's failure to engage in the practice of radiology.

159.     These steps have included, but are not limited to, purposely installing signage at the Metropolitan Avenue Facility that simply identifies the name of the professional medical corporation and the services, "US" (i.e., ultrasound), "MRI", and "X-Ray", that are available at the facility; in contrast to installing signage that may be used to identify the physician(s) that purportedly provide these services at this location.

160.     Overall, at all relevant times, Pinkhasov, Aronov, and Rafal conspired to operate and manage Fast Care Medical Diagnostics in violation of New York law.

3.     ARIS DIAGNOSTIC MEDICAL

161.     Aronov and Pinkhasov continued to operate and control AP Diagnostic Medical at the 101st Avenue Facility unfettered until August 16, 2012, when Aronov and AP Diagnostic Medical were named as defendants in the matter _Government Employees Ins. Co. et al. v. Iosif Aronov, M.D. et al._, United States District Court for the Eastern District of New York, Civil Action No.: 1:12-cv-04101-DLI-RML (the "GEICO Suit").

162.     The GEICO Suit alleged that AP Diagnostic Medical (i) was fraudulently incorporated, as it was owned "on paper" by a physician (i.e., Aronov) whose field of practice was internal medicine and who did not engage in the practice of radiology, and (ii) billed for diagnostic imaging services that were rendered by independent contractors (e.g., Mark Shapiro, M.D.), who had no employment relationship to AP Diagnostic Medical.

163.     Thereafter, Pinkhasov and Aronov purposely established a new diagnostic imaging company to create the impression that a "clean PC" began operating at the 101st Avenue Facility.

164.     Pinkhasov, a layperson, and/or Aronov, an internist, subsequently recruited Ryoo, a licensed radiologist, to partner with Aronov to serve as the nominal physician-owners of Aris Diagnostic Medical.

165.     To circumvent New York law and induce the Education Department to issue a certificate of authority, Pinkhasov conspired with Aronov and Ryoo to falsely represent in the corporate filings that Aronov and Ryoo were the sole shareholders, officers, and/or directors of Aris Diagnostic Medical.

166.     Aris Diagnostic Medical was subsequently incorporated on or about September 24, 2012, only 39 days after the filing of the GEICO Suit.

167.    Upon its incorporation, Aris Diagnostic Medical began utilizing the same office space, the same diagnostic imaging equipment, and the same telephone number (i.e., (718)-577-5152), that had been previously utilized by AP Diagnostic Medical.

168.    Like Fast Care Medical Diagnostics, at all relevant times, Pinkhasov and Aronov, not Ryoo, have exercised substantial control over the operation and management of Aris Diagnostic Medical.

169.    Pinkhasov and Aronov used the façade of Aris Diagnostic Medical to do indirectly what they were forbidden from doing directly, namely: (a) controlling the practice of a diagnostic imaging facility; and (b) charging for (and deriving economic benefit from) the purported provision of diagnostic imaging services at the 101st Avenue Facility.

170.    To solidify the unlawful management and control over Aris Diagnostic Medical, Aronov and Ryoo were caused to enter into the Operating Agreement of Aris Diagnostic Medical on or about August 27, 2014.

171.    At face value and similar to the Operating Agreement of Fast Care Medical Diagnostics, the Operating Agreement of Aris Diagnostic Medical purports to serve as an accord between the parties to, "define the terms of their relationship, impose restrictions on the transfer or other disposition of the Units, grant rights with respect to the transfer of Units, provide for the disposition of the Units of a Withdrawing Member … and provide for other contingencies."

172.    Likewise, the Operating Agreement of Aris Diagnostic Medical grants the sole management and control of the professional medical corporation to Aronov, an internist, rather than Ryoo, a licensed radiologist.

173.    The Operating Agreement of Aris Diagnostic Medical explicitly states that, "as long as each of Aronov and Ryoo shall continue to be the record and beneficial owner of his respective Units, Aronov shall be elected as the sole Managing Member of the Company."

174.    Akin to Fast Care Medical Diagnostics, as the Managing Member, Aronov was "solely responsible for all day to day operations of the Company, including hiring and firing administrative personnel, oversight of billing and collections, handling accounts payable … and managing all financial, accounting and legal matters."

175.    Furthermore, the Operating Agreement of Aris Diagnostic placed the same restrictions on the transfer, assignment, pledge, or encumbrance of the Aris Diagnostic Medical Units on Ryoo that the Operating Agreement of Fast Care Medical Diagnostics placed on Rafal.

176.    Although the Operating Agreement of Aris Diagnostic Medical required any action to be taken by the Members of the Company (i.e., Aronov and Ryoo) to be approved by at least fifty-one (51%) percent of membership interests entitled to vote, Aronov maintained full control by requiring that, "no action may be taken without Aronov voting in favor thereof."

177.    These restrictions were set in place to restrict Ryoo's involvement in the professional medical corporation and reinforce Aronov's control, as Aronov maintained an 80% membership interest in Aris Diagnostic Medical in contrast to Ryoo's 20% membership interest.

178.    Analogous to that of Fast Care Medical Diagnostics, the Operating Agreement of Aris Diagnostic contained the same caveat regarding the transfer of Aronov's ownership interest to his wife and her assumption of the position as the new sole Managing Member, notwithstanding her failure to practice in the field of radiology.

179.    Pursuant to the terms of the Operating Agreement of Aris Diagnostic Medical, Ryoo never: (a) controlled or maintained any of Aris Diagnostic Medical' corporate books and

records; (b) selected, directed, and/or controlled any of the individuals and entities that were responsible for the handling of Aris Diagnostic Medical' business affairs; or (c) hired or supervised any of Aris Diagnostic Medical' employees or independent contractors.

180.     Ryoo was, at best, nothing more than an employee of Aris Diagnostic Medical, who was tasked with reading and interpreting MRI films and other radiology studies.

181.     At all relevant times, Pinkhasov and Aronov have exercised substantial control over the operation and management of Aris Diagnostic Medical, despite neither being a licensed radiologist.

182.     Similar to Fast Care Medical Diagnostics, in furtherance of this scheme, Pinkhasov and/or Aronov caused Aris Diagnostic Medical to enter into at least five (5) "marketing", "management", and "service" agreements in order to obtain patient referrals.

183.     At all relevant times, the equipment owned by Pinkhasov was utilized to facilitate the operation of the 101st Avenue Facility, and the management and control of Aris Diagnostic Medical.

184.     At all relevant times, Aronov has actively participated in the day-to-day management of Aris Diagnostic Medical' business affairs without engaging in the practice of radiology or participating in the rendering of the healthcare services that are purportedly available at the 101st Avenue Facility.

185.     Because their conduct was unlawful, the defendants purposely and knowingly took steps to conceal Pinkhasov's role in in the operation and management of the 101st Avenue Facility and Aronov's failure to engage in the practice of radiology.

186.     These steps have included, but are not limited to, purposely installing signage at the 101st Avenue Facility that simply identifies the name of the professional medical corporation

and the "Open MRI" service that is available at the facility; in contrast to installing signage that may be used to identify the physician(s) that purportedly provide these services at this location.

187.    These steps have also included the use of various corporations and limited liability companies to conceal Pinkhasov's involvement in the operation of Aris Diagnostic Medical.

188.    The records filed with the New York Department of State, Division of Corporations indicate that Pinkhasov incorporated the durable medical equipment supply company, Accelerated DME Recovery, Inc. ("Accelerated DME Recovery") on or about July 31, 2012, just under two months before the incorporation of Aris Diagnostic Medical.

189.    In addition to serving as another vehicle for providing healthcare services to No-Fault claimants, Accelerated DME Recovery furnished Pinkhasov with a reason to be at the 101st Avenue Facility, as Accelerated DME Recovery's principal executive office is located directly next door at 88-11 101st Avenue, Ozone Park, New York.

190.    Moreover, on or about September 1, 2017, Aris Diagnostic Medical entered into an Agreement of Lease with 88-09 101 Avenue, LLC for the continued use of the office space located at the 101st Avenue Facility.

191.    The documents filed with the New York City Department of Finance and the New York City Department of Buildings indicate that Olga Khakham is the managing member of 88-09 101 Avenue, LLC, which acquired the property located at 88-09 101st Avenue in Ozone Park, New York on or about August 24, 2017.

192.    Notably, Olga Khakham is the maiden name and alias of Pinkhasov's wife, Olga Pinkhasov.

193.    Overall, at all relevant times, Pinkhasov, Aronov, and Ryoo conspired to operate and manage Aris Diagnostic Medical in violation of New York law.

**B.    FACTUAL ALLEGATIONS REGARDING THE DEFENDANTS' PROVISION OF AND BILLING FOR FRAUDULENT MRI SERVICES**

194.    The MRI reports generated by the PC Defendants and submitted to Allstate in support of the PC Defendants' demands for reimbursement under New York's No-Fault laws are false and fraudulent because the findings expressed therein materially misrepresent what is expressed on the corresponding images.

195.    An MRI is intended to provide a clear visual of the body and/or limb that is being scanned and should be free of any artifacts or blurriness in order to ascertain the proper diagnosis. When these issues are present, the ability to read an MRI is hindered and it becomes significantly more difficult to rely upon the images.

196.    In MRI studies performed by Aris Diagnostic Medical, the images were of very low quality and at times borderline diagnostic, likely due to the low field magnet used and improper/lack of routine maintenance and software updates on the imaging machines.

197.    In some cases, the PC Defendants' MRI reports misrepresent the patients' conditions because they describe findings that are more severe than what is actually reflected in the corresponding image.

198.    In other cases, the PC Defendants' MRI reports deliberately misrepresent the patients' conditions because they describe findings that are not at all supported by the corresponding image.

199.    Additionally, in certain instances, the PC Defendants' MRI reports actually fail to include conditions that are present in the corresponding image.

200.    Overall, the defendants have caused the PC Defendants to purposely misrepresent to Allstate the true nature of the patients' actual injuries, if any.

201.    In doing so, the PC Defendants sought—and in some instances received—reimbursement for radiological services that were false and fraudulent.

202.    The following examples serve to demonstrate, with particularity, how the defendants' MRI reports materially misrepresent the actual condition of the PC Defendants' patients.

        **1.**        **Patient J.V. (Claim No. 0478847791)**

203.    Patient J.V. (Claim No. 0478847791) underwent a MRI of the cervical spine at the 101st Avenue Facility on November 17, 2017.

204.    Thereafter, using the U.S. Mail, the defendants, through Aris Diagnostic Medical, submitted to Allstate documentation supporting Aris Diagnostic Medical's demand for No-Fault reimbursement in connection with the services provided to J.V.

205.    The report generated by Aris Diagnostic Medical in connection with J.V. for the cervical spine MRI described, among other things, disc herniation at the C3-C4 level, disc bulging at the C5-C6 level, dextroscollosis of the cervical and upper thoracic spine that might reflect the presence of an underlying muscle spasm.

206.    If true, the report for J.V. reflects significant injuries, possibly warranting further medical intervention.

207.    The findings reported for J.V. are false, however, as the images of J.V.'s cervical spine taken on November 17, 2017, indicate that the disc has essentially a normal appearance with no loss of intervertebral disc height to suggest that material has herniated from the disc space.

208.    Accordingly, the November 17, 2017, report for the MRI of J.V.'s cervical spine is false and fraudulent, and Aris Diagnostic Medical's charges for the services purportedly provided to J.V. are not eligible for reimbursement under New York's No-Fault laws.

**2.      Patient N. A. (Claim No. 0486319411)**

209.    Patient N.A. (Claim No. 0486319411) underwent a MRI of the cervical spine at the 101st Avenue Facility on February 15, 2018.

210.    Thereafter, using the U.S. Mail, the defendants, through Aris Diagnostic Medical, submitted to Allstate documentation supporting Aris Diagnostic Medical's demand for No-Fault reimbursement in connection with the services provided to N.A.

211.    The report generated by Aris Diagnostic Medical in connection with N.A. for the cervical spine MRI described, among other things, a one (1) millimeter posterior subluxation of C6 upon C7, question of a central disc herniation at the C3-C4 level, focal central disc herniation at the C4-C5 level, central and left central disc herniation at the C5-C6 level, and disc bulging at the C6-C7 disc space.

212.    If true, the report for N.A. reflects significant injuries, possibly warranting further medical intervention.

213.    The findings reported for N.A. are false, however, as the low quality of the images of N.A.'s cervical spine taken on February 15, 2018, can neither confirm nor deny the very small amount (i.e., one (1) millimeter) of the reported subluxation, and as the images do not contain any evidence of disc herniations given the lack of disc space narrowing at each level.

214.    Accordingly, the February 15, 2018, report for the MRI of N.A.'s cervical spine is false and fraudulent, and Aris Diagnostic Medical's charges for the services purportedly provided to N.A are not eligible for reimbursement under New York's No-Fault laws.

**3.      Patient S.R. (Claim No. 0475240965)**

215.    Patient S.R. (Claim No. 0475240965) underwent a MRI of the cervical and lumbar spine at the 101st Avenue Facility on November 22, 2017.

216.    Thereafter, using the U.S. Mail, the defendants, through Aris Diagnostic Medical, submitted to Allstate documentation supporting Aris Diagnostic Medical's demand for No-Fault reimbursement in connection with the services provided to S.R.

217.    The report generated by Aris Diagnostic Medical in connection with S.R. for the cervical spine MRI described, among other things, disc herniations at the C3-C4, C4-C5, and C5-C6 levels and disc bulging at the C6-C7 disc space.

218.    Likewise, the report generated by Aris Diagnostic Medical in connection with S.R. for the lumbar spine MRI described, among other things, anterior disc pre-lapse at the L2-L3 and L3-L4 levels, central disc herniation at the L2-L3 level, and right lateral disc herniation at the L5-S1 disc space.

219.    If true, the report for S.R. reflects significant injuries, possibly warranting further medical intervention.

220.    The findings reported for S.R. are false, however, as the reading radiologist did not identify the disc osteophyte complexes, which are chronic in nature and caused by degenerative disc disease, that are present in the images that were taken on November 22, 2017.  Further, the multi-level nature of involvement favors chronic degenerative pathology given that a single vector of force (e.g., a motor vehicle accident) would not be expected to account for pathology at multiple levels of the spine.

221.    Accordingly, the November 22, 2017, reports for the MRI of S.R.'s cervical and lumbar spine are false and fraudulent, and Aris Diagnostic Medical's charges for the services purportedly provided to S.R. are not eligible for reimbursement under New York's No-Fault laws.

4.      **Patient A.O. (Claim No. 0485747778)**

222.      Patient A.O. (Claim No. 0485747778) underwent a MRI of the cervical and lumbar spine at the 101st Avenue Facility on January 22, 2018.

223.      Thereafter, using the U.S. Mail, the defendants, through Aris Diagnostic Medical, submitted to Allstate documentation supporting Aris Diagnostic Medical's demand for No-Fault reimbursement in connection with the services provided to A.O.

224.      The report generated by Aris Diagnostic Medical in connection with A.O. for the cervical spine MRI described, among other things, a one (1) millimeter posterolisthesis of C6 upon C7 and a central disc herniation at the upper aspect of the C6-C7 level.

225.      Likewise, the report generated by Aris Diagnostic Medical in connection with A.O. for the lumbar spine MRI described, among other things, a one (1) millimeter posterolisthesis of L4 upon L5 and L5 upon S1, annular disc bulging at the L4-L5 level, and annual disc bulging at the L5-S1 disc space.

226.      If true, the report for A.O. reflects significant injuries, possibly warranting further medical intervention.

227.      The findings reported for the MRI of A.O.'s cervical spine are misrepresented, however, as the posterior marginal osteophyte component (i.e., a chronic disc bulge) of the adjacent endplates, which takes years to develop and is not posttraumatic, is not described in the report.

228.      Further, the findings reported for the MRI of A.O.'s lumbar spine are inaccurate, as the reported disc bulges at the L4-L5 level and L5-S1 disc space actually represent disc herniations.

229.     Accordingly, the January 22, 2018, reports for the MRI of A.O.'s cervical and lumbar spine are false and fraudulent, and Aris Diagnostic Medical's charges for the services purportedly provided to A.O. are not eligible for reimbursement under New York's No-Fault laws.

**5.     Patient V.R. (Claim No. 0569612707)**

230.     Patient V.R. (Claim No. 0569612707) underwent a MRI of the cervical spine at the Metropolitan Avenue Facility on December 14, 2019.

231.     Thereafter, using the U.S. Mail, the defendants, through Fast Care Medical Diagnostics, submitted to Allstate documentation supporting Fast Care Medical Diagnostics' demand for No-Fault reimbursement in connection with the services provided to V.R.

232.     The report generated by Fast Care Medical Diagnostics in connection with V.R. for the cervical spine MRI described, among other things, two (2) millimeter central disc herniations at the C2-C3, C3-C4, and C4-C5 levels, a C5-C6 annular disc bulge, and a broad-based left paracentral disc herniation at the C6-C7 level.

233.     If true, the report for V.R. reflects significant injuries, possibly warranting further medical intervention.

234.     The findings reported for V.R. are false, however, as the images of V.R.'s cervical spine taken on December 14, 2019, do not contain any evidence of herniations, as there is no loss of intervertebral disc height.

235.     The images of V.R.'s cervical spine represent disc bulges, wherein the multilevel nature of the findings would favor chronic processes (i.e., normal daily activity and stresses) as opposed to a single vector of force (e.g., a motor vehicle accident), which would tend to account for pathology at only a single intervertebral disc level.

236.     Accordingly, the December 14, 2019, report for the MRI of the V.R.'s cervical spine is false and fraudulent, and Fast Care Medical Diagnostics' charges for the services purportedly provided to V.R. are not eligible for reimbursement under New York's No-Fault laws.

### 6.     Patient P.T. (Claim No. 0536980337)

237.     Patient P.T. (Claim No. 0536980337) underwent a MRI of the left shoulder and left hip at the Metropolitan Avenue Facility on March 28, 2019.

238.     Thereafter, using the U.S. Mail, the defendants, through Fast Care Medical Diagnostics, submitted to Allstate documentation supporting Fast Care Medical Diagnostics' demand for No-Fault reimbursement in connection with the services provided to P.T.

239.     The report generated by Fast Care Medical Diagnostics in connection with P.T. for the left hip MRI described, among other things, trace hip joint fluid, symmetric arthritic change with joint space narrowing, and a potential uterine fibroid with deviation of the uterus to the left, with no other focal pathology.

240.     Likewise, the report generated by Fast Care Medical Diagnostics in connection with P.T. for the left shoulder described, among other things, effusion, synovitis, impingement, cuff tendinosis and/or tinnitus, erosions and/or subchondral cysts, and hypoplastic labrum and bicep tendon.

241.     If true, the report for P.T. reflects significant injuries, possibly warranting further medical intervention.

242.     The findings reported for P.T.'s left shoulder, however, are misrepresented, as there are no posttraumatic associated findings given the history of a motor vehicle accident as the cause of the clinical indication.  Each of the impressions discussed with regard to P.T.'s left shoulder suggest processes that are not acute and definitely not posttraumatic.

243.     Further, the findings reported for P.T.'s left hip fall below the standard of care, as the reading radiologist failed to describe the marrow edema seen in the region of the left acetabulum anteriorly and the superior pubic ramus, as well as the inferior pubic ramus.  The possibility of posttraumatic sequela such as a pelvic fracture would be considered likely given the claimant's history, with additional clinical and radiographic evaluation appropriate to further correlate this finding.  To not see or describe such a finding and instead identify a subtle asymmetry is evidence that this finding is below the applicable standard of care.

244.     Accordingly, the March 28, 2019, reports for the MRI of the P.T.'s left hip and left shoulder are false and fraudulent, and Fast Care Medical Diagnostics' charges for the services purportedly provided to P.T. are not eligible for reimbursement under New York's No-Fault laws.

### 7.     Patient U.S. (Claim No. 0541682126)

245.     Patient U.S. (Claim No. 0541682126) underwent a MRI of the cervical spine at the Metropolitan Avenue Facility on May 23, 2019.

246.     Thereafter, using the U.S. Mail, the defendants, through Fast Care Medical Diagnostics, submitted to Allstate documentation supporting Fast Care Medical Diagnostics' demand for No-Fault reimbursement in connection with the services provided to U.S.

247.     The report generated by Fast Care Medical Diagnostics in connection with U.S. for the cervical spine MRI described, among other things, C3-C4, C4-C5, C5-C6, and C6-C7 level herniations and higher grade spinal stenosis at C5-C6 disc space.

248.     If true, the report for U.S. reflects significant injuries, possibly warranting further medical intervention.

249.     The findings reported for U.S. are false, however, as the images taken on May 23, 2019, do not contain any evidence of disc space narrowing or herniation at the C3-C4, C4-C5, C5-C6, and C6-C7 disc level.

250.     Rather, there is an unreported disc herniation at the C5-C6 level with prominent osteophyte growth and disc material mildly indenting the ventral aspect of the cervical cord causing spinal stenosis, which would not be unexpected to produce symptoms.

251.     Accordingly, the May 23, 2019, report for the MRI of the U.S.'s cervical spine is false and fraudulent, and Fast Care Medical Diagnostics' charges for the services purportedly provided to U.S. are not eligible for reimbursement under New York's No-Fault laws.

**8.     Patient G.G. (Claim No. 0539707900)**

252.     Patient G.G. (Claim No. 0539707900) underwent a MRI of the neck at the Metropolitan Avenue Facility on May 21, 2019.

253.     Thereafter, using the U.S. Mail, the defendants, through Fast Care Medical Diagnostics, submitted to Allstate documentation supporting Fast Care Medical Diagnostics' demand for No-Fault reimbursement in connection with the services provided to G.G.

254.     The report generated by Fast Care Medical Diagnostics in connection with G.G. for the neck MRI described, among other things, C3-C4, C4-C5, C5-C6, and C6-C7 disc herniations with central spinal stenosis.

255.     If true, the report for G.G. reflects significant injuries, possibly warranting further medical intervention.

256.     The findings reported for G.G. are false, however, as the images taken on May 21, 2019, of G.G.'s neck do not contain any evidence of disc narrowing to support a herniation diagnosis.

257.    The findings further do not describe the osteophyte components that are present at these levels, which suggest chronic processes and not that of a single vector of force (e.g., a motor vehicle accident), which would tend to account for pathology at only a single intervertebral level.

258.    Accordingly, the May 21, 2019, report for the MRI of the G.G.'s neck is false and fraudulent, and Fast Care Medical Diagnostics' charges for the services purportedly provided to G.G. are not eligible for reimbursement under New York's No-Fault laws.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

259.    Throughout the course of this entire scheme, Aronov, Rafal, Ryoo, and Pinkhasov created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

260.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters and request for payments in connection with the insurance claims reference throughout this pleading traveled through the U.S. Mail.

261.    Every automobile insurance claim detailed within, involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to

the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

A.   FAST CARE MEDICAL DIAGNOSTICS ENTERPRISE

262.   Aronov, Rafal, and/or Pinkhasov either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Fast Care Medical Diagnostics to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

263.   Aronov, Rafal, and/or Pinkhasov caused Fast Care Medical Diagnostics to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Fast Care Medical Diagnostics mailed a demand for payment (i.e., invoice) to Allstate.

264.   Pinkhasov's management and control of Fast Care Medical Diagnostics, combined with Pinkhasov's unlawful receipt of Fast Care Medical Diagnostics' professional physician fees and profits, rendered Fast Care Medical Diagnostics completely ineligible for No-Fault reimbursement under New York law.

265.   Because Fast Care Medical Diagnostics was, in fact, unlawfully controlled by Pinkhasov (a non-physician), Aronov, Rafal, and Pinkhasov purposely caused Fast Care Medical Diagnostics to make a misrepresentation each and every time that Fast Care Medical Diagnostics mailed a document to Allstate claiming eligibility for reimbursement.

266.   Moreover, because (a) Pinkhasov unlawfully controlled Fast Care Medical Diagnostics, (b) Aronov and Rafal fraudulently incorporated Fast Care Medical Diagnostics, (c) Aronov, Rafal, and/or Pinkhasov caused Fast Care Medical Diagnostics to seek No-Fault reimbursement from Allstate (even though Aris was not entitled to such reimbursement), and (d)

Fast Care Medical Diagnostics used the U.S. Mail to seek reimbursement, it is clear that Aronov, Rafal, and Pinkhasov committed mail fraud.

267.    At all relevant times, Aronov, Rafal, and Pinkhasov knew that Fast Care Medical Diagnostics, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Fast Care Medical Diagnostics.

268.    Allstate estimates that the unlawful operation of the Fast Care Medical Diagnostics enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 1 and incorporated by reference as if set forth in its entirety.

### B.    ARIS DIAGNOSTIC MEDICAL ENTERPRISE

269.    Aronov, Ryoo, and/or Pinkhasov either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Aris Diagnostic Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

270.    Aronov, Ryoo, and/or Pinkhasov caused Aris Diagnostic Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Aris Diagnostic Medical mailed a demand for payment (i.e., invoice) to Allstate.

271.    Pinkhasov's management and control of Aris Diagnostic Medical, combined with Pinkhasov's unlawful receipt of Aris Diagnostic Medical's  professional physician fees and profits, rendered Aris Diagnostic Medical completely ineligible for No-Fault reimbursement under New York law.

272.     Because Aris Diagnostic Medical was, in fact, unlawfully controlled by Pinkhasov (a non-physician), Aronov, Ryoo, and Pinkhasov purposely caused Aris Diagnostic Medical to make a misrepresentation each and every time that Aris Diagnostic Medical mailed a document to Allstate claiming eligibility for reimbursement.

273.     Moreover, because (a) Pinkhasov unlawfully controlled Aris Diagnostic Medical, (b) Aronov and Ryoo fraudulently incorporated Aris Diagnostic Medical, (c) Aronov, Ryoo, and/or Pinkhasov caused Aris Diagnostic Medical to seek No-Fault reimbursement from Allstate (even though Aris was not entitled to such reimbursement), and (d) Aris Diagnostic Medical used the U.S. Mail to seek reimbursement, it is clear that Aronov, Ryoo, and Pinkhasov committed mail fraud.

274.     At all relevant times, Aronov, Ryoo, and Pinkhasov knew that Aris Diagnostic Medical, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Aris Diagnostic Medical.

275.     Allstate estimates that the unlawful operation of the Aris Diagnostic Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 2 and incorporated by reference as if set forth in its entirety.

## VII.   SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.   FRAUDULENT CONCEALMENT OF PINKHASOV'S UNLAWFUL CONTROL OF THE FAST CARE MEDICAL DIAGNOSTICS ENTERPRISE

276.     Pinkhasov induced Aronov and Rafal to register themselves with the State of New York as Fast Care Medical Diagnostics' sole shareholders, officers, and/or directors.

277.    The documents created and filed with the State of New York related to Fast Care Medical Diagnostics deliberately omitted any reference to Pinkhasov's involvement with Aronov, Rafal, or Fast Care Medical Diagnostics.

278.    Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Fast Care Medical Diagnostics, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Pinkhasov's partnership with Aronov and control Rafal and Fast Care Medical Diagnostics.

279.    Pinkhasov's, Aronov's, and Rafal's purposeful concealment of Pinkhasov's controlling interest in Fast Care Medical Diagnostics allowed Pinkhasov to unlawfully control Fast Care Medical Diagnostics undetected.

280.    At all times relevant during the operation of the Fast Care Medical Diagnostics enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Fast Care Medical Diagnostics, Pinkhasov, Aronov, and Rafal caused Fast Care Medical Diagnostics to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

281.    Pinkhasov directly participated in the operation and control of Fast Care Medical Diagnostics, and thus caused Fast Care Medical Diagnostics to falsely claim eligibility for No-Fault reimbursement.

282.    Further, Iosif and Rafal attested (or caused the attestation) to the medical necessity of the services that they (or persons under his direction and control) allegedly performed in connection with Fast Care Medical Diagnostics patients, as well as the validity of the charges for such services.

283.    At all relevant times, Iosif and Rafal, as duly licensed physicians, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with any other aspect of their oath as licensed medical professionals.

284.    At all relevant times, Pinkhasov, Aronov and Rafal actively concealed from Allstate facts regarding Fast Care Medical Diagnostics' true ownership and control to prevent Allstate from discovering that Fast Care Medical Diagnostics was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

285.    Many of these facts—particularly Fast Care Medical Diagnostics' splitting of professional physician fees and profits with Pinkhasov—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

286.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

287.    Thus, every time that Pinkhasov, Aronov and Rafal (along with those individuals working under their control) caused Fast Care Medical Diagnostics to submit No-Fault reimbursement demands to Allstate, Pinkhasov, Rafal, and Aronov (and those individuals working under their control) necessarily certified that Fast Care Medical Diagnostics was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

288.    The full extent of Pinkhasov's, Aronov's and Rafal's fraudulent and unlawful acts relative to their control over the Fast Care Medical Diagnostics enterprise—including (a) Pinkhasov's management and control of Fast Care Medical Diagnostics, and (b) the unlawful

channeling of Fast Care Medical Diagnostics' professional proceeds to Pinkhasov—was not, and could not have been, known to Allstate until it commenced this action.

### B.   FRAUDULENT CONCEALMENT OF PINKHASOV'S UNLAWFUL CONTROL OF THE ARIS DIAGNOSTIC MEDICAL ENTERPRISE

289.    Pinkhasov induced Aronov and Ryoo to register themselves with the State of New York as Aris Diagnostic Medical's sole shareholders, officers, and/or directors.

290.    The documents created and filed with the State of New York related to Aris Diagnostic Medical deliberately omitted any reference to Pinkhasov's involvement with Aronov, Ryoo, or Aris Diagnostic Medical.

291.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Aris Diagnostic Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Pinkhasov's partnership with Aronov and control over Ryoo and Aris Diagnostic Medical.

292.    Pinkhasov's, Aronov's, and Ryoo's purposeful concealment of Pinkhasov's controlling interest in Aris Diagnostic Medical allowed Pinkhasov to unlawfully control Aris Diagnostic Medical undetected.

293.    At all times relevant during the operation of the Aris Diagnostic Medical enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Aris Diagnostic Medical, Pinkhasov, Aronov, and Ryoo caused Aris Diagnostic Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

294.    At all times relevant, Pinkhasov directly participated in the operation and control of Aris Diagnostic Medical, and thus caused Aris Diagnostic Medical to falsely claim eligibility for No-Fault reimbursement.

295.    Further, Aronov and Ryoo attested (or caused the attestation) to the medical necessity of the services that they (or persons under their direction and control) allegedly performed in connection with Aris Diagnostic Medical patients, as well as the validity of the charges for such services.

296.    At all relevant times, Aronov and Ryoo, as duly licensed physicians, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with any other aspect of their oath as licensed medical professionals.

297.    At all relevant times, Pinkhasov, Aronov, and Ryoo actively concealed from Allstate facts regarding Aris Diagnostic Medical's true ownership and control to prevent Allstate from discovering that Aris Diagnostic Medical was fraudulently incorporated and owned and controlled by one or more non-physician (i.e., Pinkhasov) and was therefore ineligible to bill for or collect No-Fault benefits.

298.    Many of these facts—particularly Aris Diagnostic Medical's splitting of professional physician fees and profits with Pinkhasov—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

299.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

300.    Thus, every time that Pinkhasov, Aronov, and Ryoo (along with those individuals working under their control) caused Aris Diagnostic Medical to submit No-Fault reimbursement demands to Allstate, Pinkhasov, Aronov, and Ryoo (and those individuals working under their

control) necessarily certified that Aris Diagnostic Medical was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

301.    The full extent of Pinkhasov's, Aronov's, and Ryoo's fraudulent and unlawful acts relative to their control over the Aris Diagnostic Medical enterprise—including (a) Pinkhasov's management and control of Aris Diagnostic Medical, and (b) the unlawful channeling of Aris Diagnostic Medical's professional proceeds to Pinkhasov—was not, and could not have been, known to Allstate until it commenced this action.

### C.    ALLSTATE'S JUSTIFIABLE RELIANCE

302.    Each claim submitted to Allstate by (or on behalf of) Fast Care Medical Diagnostics and Aris Diagnostic Medical was verified pursuant to Insurance Law § 403.

303.    At all relevant times, Aronov, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

304.    At all relevant times, Rafal, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

305.    At all relevant times, Ryoo, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

306.    To induce Allstate to promptly pay Fast Care Medical Diagnostics' and Aris Diagnostic Medical's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or other invoices certifying that Fast Care Medical Diagnostics and Aris Diagnostic Medical were eligible to be reimbursed under New York's No-Fault Laws.

307.     Further, to induce Allstate to promptly pay the fraudulent charges for diagnostic imaging services purportedly provided to patients of Fast Care Medical Diagnostics and Aris Diagnostic Medical, the defendants hired law firms to pursue collection of the fraudulent charges from Allstate. These law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Fast Care Medical Diagnostics' and Aris Diagnostic Medical's charges are not paid in full.

308.     Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

309.     At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Fast Care Medical Diagnostics' and Aris Diagnostic Medical's reimbursement eligibility under New York law.

310.     In reasonable reliance on these misrepresentations, Allstate paid money to Fast Care Medical Diagnostics and Aris Diagnostic Medical to its detriment.

311.     Allstate would not have paid these monies had the defendants provided true and accurate information about Fast Care Medical Diagnostics' and Aris Diagnostic Medical's reimbursement eligibility under New York law, including the fact and necessity of the services provided.

312.     As a result, Allstate has paid in excess of $1,510,679.06 in reasonable reliance on the defendants' false medical documentation and false representations regarding Fast Care Medical Diagnostics' and Aris Diagnostic Medical's eligibility for reimbursement under New York's No-Fault Laws.

## VIII.   **DAMAGES**

313.     The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments made in connection with first-party claims in excess of $1,510,679.06, the exact amount to be determined at trial, including:

(a)     Payments made to Fast Care Medical Diagnostics in connection with first-party claims in excess of $688,067.87, the exact amount to be determined at trial. The chart annexed as Exhibit 3, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Fast Care Medical Diagnostics in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b)     Payments made to Aris Diagnostic Medical in connection with first-party claims in excess of $822,611.19, the exact amount to be determined at trial. The chart annexed as Exhibit 4, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Aris Diagnostic Medical in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## IX.     **CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FAST CARE MEDICAL DIAGNOSTICS, PLLC ENTERPRISE**
**(Against Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D.)**

314.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

315.     Fast Care Medical Diagnostics, PLLC ("Fast Care Medical Diagnostics") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

316.     In connection with the operation and management of the Fast Care Medical Diagnostics enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D., (collectively, the "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Fast Care Medical Diagnostics' business, or should have reasonably foreseen that the mailing of such false medical documentation by Fast Care Medical Diagnostics would occur, in furtherance of their scheme to defraud.

317.     The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

318.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

319.     Policies of insurance were delivered to insureds through the U.S. Mail.

320.     Payments to Fast Care Medical Diagnostics traveled through the U.S. Mail.

321.     As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Fast Care Medical Diagnostics, to collect payment

from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

322.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Fast Care Medical Diagnostics for the benefit of the Count I Defendants that would not otherwise have been paid.

323.     The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

324.     The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

325.     By mailing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

326.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Fast Care Medical Diagnostics for the benefit of the Count I Defendants.

327.     The Count I Defendants participated in the conduct of the Fast Care Medical Diagnostics enterprise through a pattern of racketeering activities.

328.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

329.     The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

330.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

331.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

332.     By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION 18 U.S.C. § 1962(d)**
**FAST CARE MEDICAL DIAGNOSTICS, PLLC ENTERPRISE**
**(Against Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D.)**

333.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

334.     Defendants Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D. (collectively, the "Count II Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Fast Care Medical Diagnostics, PLLC ("Fast Care Medical Diagnostics").

335.     The Count II Defendants each agreed to further, facilitate, support, and operate the Fast Care Medical Diagnostics enterprise.

336.     As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

337.     The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Fast Care Medical Diagnostics even though Fast Care Medical Diagnostics was not eligible to collect such benefits by virtue of its unlawful conduct.

338.     The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

339.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count II Defendants' unlawful conduct described herein.

340.     By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ARIS DIAGNOSTIC MEDICAL, PLLC ENTERPRISE**
**(Against Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D.)**

341.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

342.     Aris Diagnostic Medical, PLLC ("Aris Diagnostic Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

343.     In connection with the operation and management of the Aris Diagnostic Medical enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D. (collectively, the "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Aris Diagnostic Medical's business, or should have reasonably foreseen that

55

the mailing of such false medical documentation by Aris Diagnostic Medical would occur, in furtherance of their scheme to defraud.

344.    The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 2.

345.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

346.    Policies of insurance were delivered to insureds through the U.S. Mail.

347.    Payments to Aris Diagnostic Medical traveled through the U.S. Mail.

348.    As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Aris Diagnostic Medical to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

349.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Aris Diagnostic Medical for the benefit of the Count III Defendants that would not otherwise have been paid.

350.    The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

351.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

352.     By mailing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

353.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Aris Diagnostic Medical for the benefit of the Count III Defendants.

354.     The Count III Defendants participated in the conduct of the Aris Diagnostic Medical enterprise through a pattern of racketeering activities.

355.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

356.     The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

357.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

358.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

359.     By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATION 18 U.S.C. § 1962(d)
### ARIS DIAGNOSTIC MEDICAL, PLLC ENTERPRISE
(Against Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D.)

360.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

361.    Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D. (collectively, the "Count IV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Aris Diagnostic Medical, PLLC ("Aris Diagnostic Medical").

362.    The Count IV Defendants each agreed to further, facilitate, support, and operate the Aris Diagnostic Medical enterprise.

363.    As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

364.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Aris Diagnostic Medical even though Aris Diagnostic Medical was not eligible to collect such benefits by virtue of its unlawful conduct.

365.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

366.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

367.    By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### COMMON-LAW FRAUD
#### (Against Fast Care Medical Diagnostics, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D.)

368.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

369.     Defendants, Fast Care Medical Diagnostics, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D. (collectively, the "Count V Defendants") intentionally defrauded Allstate through their submission of charges for diagnostic services that were fraudulent and/or non-compensable under New York's No-Fault laws.

370.     The Count V Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect No-Fault benefits under New York law.

371.     The misrepresentations of fact by the Count V Defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices and collection documentation.

372.     The Count V Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

373.     The misrepresentations were intentionally made by the Count V Defendants in furtherance of their scheme to defraud Allstate by submitting claims from fraudulently incorporated medical clinics for No-Fault insurance benefits and bodily injury claims.

374.     The Count V Defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not legitimate.

375.     Allstate reasonably relied, to its detriment, upon the Count V Defendants' material misrepresentations concerning the Count V Defendants' eligibility to receive No-Fault reimbursement by paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims, bodily injury claims, and uninsured/underinsured motorist claims.

376.     Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to the Count V Defendants totaling at least $688,067.87 for which the Count V Defendants were not eligible to receive under New York's No-Fault laws.

**COUNT VI**
**COMMON-LAW FRAUD**
**(Against Aris Diagnostic Medical, PLLC, Artur Pinkhasov,**
**Iosif Aronov, M.D., and Simon Ryoo, M.D.)**

377.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

378.     Defendants, Aris Diagnostic Medical, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D. (collectively, the "Count VI Defendants") intentionally defrauded Allstate through their submission of charges for diagnostic services that were fraudulent and/or non-compensable under New York's No-Fault laws.

379.     The Count VI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect No-Fault benefits under New York law.

380.     The misrepresentations of fact by the Count VI Defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices and collection documentation.

381.     The Count VI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

382.     The misrepresentations were intentionally made by the Count VI Defendants in furtherance of their scheme to defraud Allstate by submitting claims from fraudulently incorporated medical clinics for No-Fault insurance benefits and bodily injury claims.

383.     The Count VI Defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not legitimate.

384.     Allstate reasonably relied, to its detriment, upon the Count VI Defendants' material misrepresentations concerning the Count VI Defendants' eligibility to receive No-Fault reimbursement by paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims, bodily injury claims, and uninsured/underinsured motorist claims.

385.     Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to the Count VI Defendants totaling at least $822,611.19 for which the Count VI Defendants were not eligible to receive under New York's No-Fault laws.

**COUNT VII**
**UNJUST ENRICHMENT**
**(Against Fast Care Medical Diagnostics, PLLC, Artur Pinkhasov,**
**Iosif Aronov, M.D., and Richard Rafal, M.D.)**

386.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

387.     As alleged herein, Fast Care Medical Diagnostics, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D. (collectively, the "Count VII Defendants"), through various means, conspired to induce Allstate to make numerous and substantial payments to Fast Care Medical Diagnostics, PLLC pursuant to New York Law.

388.     When Allstate paid Fast Care Medical Diagnostics, PLLC, Allstate reasonably believed that it was legally obligated to make such payments based on the misrepresentations and omissions that the Count VII Defendants, or those persons working under their control, made, or were caused to make, concerning Fast Care Medical Diagnostics, PLLC's reimbursement eligibility under New York Law.

389.     Each and every payment that Allstate was caused to make to, or for the benefit of, Fast Care Medical Diagnostics, PLLC during the course of this scheme constitutes a benefit that the Count VII Defendants aggressively caused Fast Care Medical Diagnostics, PLLC to seek and voluntarily accept.

390.     Through the course of this scheme, Fast Care Medical Diagnostics, PLLC wrongfully obtained from Allstate No-Fault benefit payments totaling at least $688,067.87 as a direct and proximate result of the unlawful conduct detailed through this Complaint, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Fast Care Medical Diagnostics, PLLC.

391.     Retention of those benefits by the Count VII Defendants would violate the fundamental principles of justice, equity, and good conscience.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(Against Aris Diagnostic Medical, PLLC, Artur Pinkhasov,**
**Iosif Aronov, M.D., and Simon Ryoo, M.D.)**

392.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

393.     As alleged herein, Aris Diagnostic Medical, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D. (collectively, the "Count VIII Defendants"), through various means, conspired to induce Allstate to make numerous and substantial payments to Aris Diagnostic Medical, PLLC pursuant to New York Law.

394.     When Allstate paid Aris Diagnostic Medical, PLLC, Allstate reasonably believed that it was legally obligated to make such payments based on the misrepresentations and omissions that the Count VIII Defendants, or those persons working under their control, made, or were caused

to make, concerning Aris Diagnostic Medical, PLLC's reimbursement eligibility under New York Law.

395. Each and every payment that Allstate was caused to make to, or for the benefit of, Aris Diagnostic Medical, PLLC during the course of this scheme constitutes a benefit that the Count VIII Defendants aggressively caused Aris Diagnostic Medical, PLLC to seek and voluntarily accept.

396. Through the course of this scheme, Aris Diagnostic Medical, PLLC wrongfully obtained from Allstate No-Fault benefit payments totaling at least $822,611.19 as a direct and proximate result of the unlawful conduct detailed through this Complaint, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Aris Diagnostic Medical, PLLC.

397. Retention of those benefits by the Count VIII Defendants would violate the fundamental principles of justice, equity, and good conscience.

## COUNT IX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Fast Care Medical Diagnostics, PLLC)

398. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

399. To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes which grant the authority to provide health services in New York.

400. In view of Fast Care Medical Diagnostics, PLLC's illegal corporate structure, and/or illegal control by an individual not licensed to provide medical services, Fast Care Medical Diagnostics, PLLC has been operating in violation of New York's Business Corporation Laws,

New York's Limited Liability Company Laws, New York's Insurance Laws, and New York General Business Law § 349 (and other statutory provisions); therefore, Fast Care Medical Diagnostics, PLLC has no standing to submit, or receive payment for, assigned No-Fault benefits.

401.     Fast Care Medical Diagnostics, PLLC continues to submit assigned No-Fault claims to Allstate, and other claims remain pending with Allstate.

402.     Fast Care Medical Diagnostics, PLLC continues to challenge prior claim denials.

403.     Fast Care Medical Diagnostics, PLLC continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

404.     A justifiable controversy exists between Allstate and Fast Care Medical Diagnostics, PLLC since Fast Care Medical Diagnostics, PLLC challenges Allstate's ability to deny such claims.

405.     Allstate has no adequate remedy at law.

406.     Fast Care Medical Diagnostics, PLLC will continue to bill Allstate for No-Fault services absent a declaration by this Court that their activities are unlawful, and that Allstate has no obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by Fast Care Medical Diagnostics, PLLC.

407.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Fast Care Medical Diagnostics, PLLC was fraudulently incorporated and/or controlled by one or more non-physician in violation of New York's Business Corporation Laws, New York's Limited Liability Company Laws, New York's Insurance Laws, and New York General Business Law § 349 (and other statutory provisions), and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT X
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Aris Diagnostic Medical, PLLC)

408.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-313 as if set forth fully herein.

409.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes which grant the authority to provide health services in New York.

410.    In view of Aris Diagnostic Medical, PLLC's illegal corporate structure, and/or illegal control by an individual not licensed to provide medical services, Aris Diagnostic Medical, PLLC has been operating in violation of New York's Business Corporation Laws, New York's Limited Liability Company Laws, New York's Insurance Laws, and New York General Business Law § 349 (and other statutory provisions); therefore, Aris Diagnostic Medical, PLLC has no standing to submit, or receive payment for, assigned No-Fault benefits.

411.    Aris Diagnostic Medical, PLLC continues to submit assigned No-Fault claims to Allstate, and other claims remain pending with Allstate.

412.    Aris Diagnostic Medical, PLLC continues to challenge prior claim denials.

413.    Aris Diagnostic Medical, PLLC continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

414.    A justifiable controversy exists between Allstate and Aris Diagnostic Medical, PLLC since Aris Diagnostic Medical, PLLC challenges Allstate's ability to deny such claims.

415.    Allstate has no adequate remedy at law.

416.    Aris Diagnostic Medical, PLLC will continue to bill Allstate for No-Fault services absent a declaration by this Court that their activities are unlawful, and that Allstate has no

obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by Aris Diagnostic Medical, PLLC.

417.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Aris Diagnostic Medical, PLLC was fraudulently incorporated and/or controlled by one or more non-physician in violation of New York's Business Corporation Laws, New York's Limited Liability Company Laws, New York's Insurance Laws, and New York General Business Law § 349 (and other statutory provisions), and thus has no standing to submit or receive assigned No-Fault benefits.

## X.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**FAST CARE MEDICAL DIAGNOSTICS, PLLC ENTERPRISE**
**(Against Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D.)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION 18 U.S.C. § 1962(d)
### FAST CARE MEDICAL DIAGNOSTICS, PLLC ENTERPRISE
### (Against Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D)

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ARIS DIAGNOSTIC MEDICAL, PLLC ENTERPRISE
### (Against Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D.)

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION 18 U.S.C. § 1962(d)
### ARIS DIAGNOSTIC MEDICAL, PLLC ENTERPRISE
### (Against Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D.)

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## <u>COUNT V</u>
## COMMON-LAW FRAUD
### (Against Fast Care Medical Diagnostics, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D.)

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)     AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just.

## <u>COUNT VI</u>
## COMMON-LAW FRAUD
### (Against Aris Diagnostic Medical, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Simon Ryoo, M.D.)

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)     AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just.

## <u>COUNT VII</u>
## UNJUST ENRICHMENT
### (Against Fast Care Medical Diagnostics, PLLC, Artur Pinkhasov, Iosif Aronov, M.D., and Richard Rafal, M.D.)

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(Against Aris Diagnostic Medical, PLLC, Artur Pinkhasov,**
**Iosif Aronov, M.D., and Simon Ryoo, M.D.)**

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just.

**COUNT IX**
**DECLARATORY RELIEF**
**(Against Fast Care Medical Diagnostics, PLLC)**

(a)     DECLARE that Fast Care Medical Diagnostics, PLLC is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b)     DECLARE that Fast Care Medical Diagnostics, PLLC's activities are unlawful;

(c)     DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Fast Care Medical Diagnostics, PLLC; and

(d)     GRANT all other relief this Court deems just and appropriate.

**COUNT X**
**DECLARATORY RELIEF**
**(Against Aris Diagnostic Medical, PLLC)**

(a)     DECLARE that Aris Diagnostic Medical, PLLC is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b)     DECLARE that Aris Diagnostic Medical, PLLC's activities are unlawful;

(c)     DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Aris Diagnostic Medical, PLLC; and

(d)      GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.


KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@ktmpc.com
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
Hugh C.M. Brady (HB4724)
hbrady@ktmpc.com
350 Granite St., Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company*


Dated: May 26, 2022